Robert W. KELLEY, et al., Plaintiffs,

v.

**METROPOLITAN COUNTY BOARD OF EDUCATION OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE, et al., Defendants.**

**Nos. 2094, 2956.**

United States District Court,
M.D. Tennessee,
Nashville Division.

Feb. 23, 1983.

Avon N. Williams, Jr., Richard Dinkins, Nashville, Tenn., for plaintiffs.

William R. Willis, Jr., Marian F. Harrison, Nashville, Tenn., for defendant Metropolitan Bd. of Educ.

Frank J. Scanlon, Sr. Asst. Atty. Gen., Nashville, Tenn., for third party defendant State of Tenn.

MEMORANDUM

WISEMAN, District Judge.

## I. *Background*

This lawsuit to compel desegregation of the Nashville school system was originally filed in 1955. The long history of this litigation is summarized in *Kelley v. Metropolitan City Board of Education,* 492 F.Supp. 167, 168–78 (M.D.Tenn.1980), and need not be repeated here. The current phase of the litigation involves four distinct topics: (1) pupil assignment; (2) teacher and staff assignment; (3) plaintiffs' request for attorney's fees; and (4) plaintiffs' petition for contempt against defendant school board. The pupil assignment plan took precedence, by agreement of the parties, leaving the three other issues to be resolved at a later date. This Court held hearings on the remaining three issues on December 6, 7, and 8, 1982, at which time the parties reached a consent agreement on the question of teacher and staff assignments.

1. *Northcross* also held that the determination of whether fees were to be awarded for the entire case may depend on the existence of a

Plaintiffs now seek an award of attorney's fees pursuant to 42 U.S.C. § 1988. Since 1955, Mr. Avon N. Williams, Jr., has represented the plaintiffs in this action. In the early years of this lawsuit, Williams teamed with his former law partner, Mr. Z. Alexander Looby. Since 1977, Williams has been joined by his associate, Mr. Richard H. Dinkins, in this matter. No attorney's fees have ever been awarded in the history of this litigation.

## II. *Preliminary matters*

### A. *Applicability of the Civil Rights Attorney's Fees Act*

■ Defendant school board has not contested plaintiffs' claim that the Civil Rights Attorney's Fees Act of 1976, 42 U.S.C. § 1988, applies to this litigation. The Act declares that, in suits brought under 42 U.S.C. § 1983 and certain other statutes, federal courts may award prevailing parties reasonable attorney's fees as part of the costs. The Act applies to all cases pending on the date of its enactment. *Hutto v. Finney,* 437 U.S. 678, 695 n. 23, 98 S.Ct. 2565, 2575, n. 23, 57 L.Ed.2d 522, 537 (1978). The Sixth Circuit has held that the word "pending"

> ... means that all the issues in the case have not been finally resolved. So long as there was an active controversy in the case at the time the Act became effective, the Act applies to authorize fees for the entire case, unless special circumstances exist which would make an award manifestly unjust.

*Northcross v. Board of Education of Memphis City Schools,* 611 F.2d 624, 634 (6th Cir.1979), *cert. denied,* 447 U.S. 911, 100 S.Ct. 2999, 64 L.Ed.2d 862 (1980).[1]

In *Weisenberger v. Huecker,* 593 F.2d 49 (6th Cir.1979), the merits of the case were resolved well before passage of the Act, but the application for attorney's fees had not been resolved when the Act became effective. The Sixth Circuit held that "[s]ince

"final order" at any time in the litigation. This specific topic is addressed *infra.*

the Act was in existence at the time the district court made the fee awards, it is applicable to the instant cases." *Id.* at 53.

 In this case, plaintiffs requested fees in motions dated February 8, 1974, April 11, 1975, and October 16, 1975. Those motions, and other important motions including substantive issues, were pending when the Act took effect in 1976. Thus, *Weisenberger* and *Northcross* govern, and, as a threshold question, the Act applies.

### B. *Prevailing party*

As a preliminary matter, plaintiffs must first be found to be the prevailing party before attorney's fees can be awarded under 42 U.S.C. § 1988. Defendants claim that plaintiffs are not the prevailing party because (1) the Board stipulated *ab initio* that its schools were unconstitutionally segregated, and (2) the plaintiffs have never submitted a desegregation plan which has been implemented by the Court.

Defendants' position appears to be an overly narrow approach to the definition of prevailing party. The Sixth Circuit has stated:

> In accordance with the broad remedial purpose of the statute, parties may be considered to have prevailed when they have vindicated important rights through a consent judgment or without formally obtaining relief.

*Northcross, supra,* at 633.

 Adhering to the Sixth Circuit's mandate to look at this question in practical terms, it is clear that plaintiffs in this case are the prevailing party in this litigation. Plaintiffs have clearly prevailed as to the basic holding of this Court throughout the twenty-seven year course of this case that some type of court-ordered remedy was necessary to alleviate the effects of prior *de jure* segregation.

 Furthermore, it is not necessary for plaintiffs to have prevailed on every single legal position or argument asserted. To the contrary, plaintiffs are entitled to fees for "all time reasonably spent on a matter." *Northcross, supra,* at 636. In *Northcross,* the Court stated:

The fact that some of that time was spent in pursuing issues on research which was ultimately unproductive, rejected by the court, or mooted by intervening events is wholly irrelevant. So long as the party has prevailed on the case as a whole the district courts are to allow compensation for hours expended on unsuccessful research or litigation, unless the positions asserted are frivolous or in bad faith. There are numerous practical reasons why a court may not be permitted to dissect a lawsuit into "issues and parts of issues as to which the plaintiffs did not prevail," especially by decimating the total hours claimed with arbitrary percentages. Suffice it to say, however, that Congress has mandated that a prevailing party's attorney should be compensated "as is traditional with attorneys compensated by a fee-paying client, for all time reasonably expended on a matter." We know of no "traditional" method of billing whereby an attorney offers a discount based upon his or her failure to prevail on "issues or parts of issues." Furthermore, it would hardly further our mandate to use the "broadest and most flexible remedies available" to us to enforce the civil rights laws if we were so directly to discourage innovative and vigorous lawyering in a changing area of the law. That mandate is best served by encouraging attorneys to take the most advantageous position on their clients' behalf that is possible in good faith. The fact that these lawyers advocated a desegregation remedy of broader scope and faster pace than was ultimately adopted cannot be considered to be unreasonable. Their clients have prevailed; the Memphis school system is desegregated.

*Id.* This approach was recently reaffirmed by the Sixth Circuit. *Buian v. Baughard,* 687 F.2d 859 (6th Cir.1982) at 862. *Northcross* also allowed fees to be awarded for time spent litigating the fees question itself. *Northcross, supra,* at 643.

Thus, plaintiffs have prevailed and are entitled to fees for all time reasonably spent on matters involved in this case.

III. *Computation of Hours and Fees*

A. *Plaintiffs' Request*

Messrs. Williams and Dinkins have filed affidavits wherein they reconstruct their time spent on this lawsuit. Although Williams and Dinkins have not kept contemporaneously maintained records, they claim that the reconstruction adequately represents the services which they have performed. Plaintiffs request fees in the following amounts:

(1) Avon Williams, for the firm of Looby and Williams, 917.8 hours at $200 per hour and 36.4 days at $1,500 a day, totaling $238,160 plus a 100 percent contingency factor for a total of $476,320;

(2) Avon Williams, individually, 1,211.5 hours at $200 per hour and 87.3 days at $1,500 a day, totaling $373,250 plus a 100 percent contingency factor for a total of $746,500;

(3) Richard Dinkins, individually, 215.6 hours at $120 per hour and 38 days at $1,500 a day, totaling $82,872, plus a 100 percent contingency factor for a total of $165,744;

(4) Norman J. Chachkin, for the Legal Defense Fund, 43 hours at $200 per hour, totaling $8,600, plus a 100 percent contingency factor for a total of $17,200;

(5) Bill Lann Lee, for the Legal Defense Fund, 270.4 hours at $115 per hour, totaling $31,096, plus a 100 percent contingency factor for a total of $62,192;

(6) Legal Defense Fund, costs and expenses totaling $47,488.15.

█ In awarding fees, a district court is not compelled to accept automatically all the hours claimed, but any reductions must be clearly identified and the reason for disallowing claims must be articulated. *Northcross, supra,* at 636–37. This Court will attempt to do just that.

B. *The "Final Order" Question*

At the outset of the hearings held in December 1982, this Court made two rulings from the bench in order to limit the proof at those proceedings. First, this Court held that no fees could be awarded for services rendered prior to May 30, 1972, on which date the Sixth Circuit affirmed the desegregation plan entered by this Court in 1971. Second, this Court ruled that it lacked the authority to award fees for appellate work in this case. That ruling is addressed *infra.*

Turning to the "final order" question, one of the many issues addressed in *Northcross,* the Sixth Circuit there ruled that a prior final order in that school desegregation case could bar an award of fees for services rendered prior to that date. 611 F.2d at 635. After ruling that plaintiffs' attorneys should recover fees which the district court had denied in part, the Sixth Circuit stated:

This is not ·to say that a retroactive award of attorney's fees must be made in all school desegregation cases. *Certain interim aspects of the case may have been subject to a final order settling the issue of attorney's fees to that point, rendering the reopening of long-settled aspects of the case unfair.*

*Northcross, supra,* at 635. (emphasis added). The Court held that the fee awarded should cover at least back to 1968 when the suit became active again following new pronouncements from the United States Supreme Court which directly affected the Memphis case. The Court said, however:

There is an unresolved dispute concerning the pre-1968 period, which we leave to the district court to resolve. The School Board contended below that the district court action of July 29, 1966, the last action before the Supreme Court's *Green* [*v. County School Bd.,* 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716] decision, was a "consent order" which undertook to dispose of all outstanding phases of the case, including fees and costs. It is true that a long, complicated case of this sort can result in several "final" orders, which in the interests of finality are deemed to dispose of all foregoing issues. Absent a timely appeal, a party is bound by the order and any later challenge is deemed to be a collateral attack judged by different, and more stringent standards than on direct review. *Bradley* [*v. School Bd.*

of Richmond], *supra,* 416 U.S. [696] at 710–11, 94 S.Ct. 2006 [at 2015–16, 40 L.Ed.2d 476]. If the defendants are correct in their characterization of the 1966 action in the interest of finality, plaintiffs should not be permitted to reopen that judgment in order to obtain attorneys' fees. We leave this matter to the district court. However, from 1968 until shortly before the application for fees was made by the plaintiffs, the case was in continuous, active litigation. Not only was there no "final judgment" which could reasonably be said to settle the issue of fees during that period, but there was no time to raise the matter of fees at all.

*Id.*

On remand, the district court denied plaintiffs' request for fees for services rendered prior to 1968. *Northcross v. Board of Education of Memphis City Schools,* Civil Action No. 3931, January 14, 1982 (W.D. Tenn.). Judge McRae gave the following explanation:

> The Court finds that the services expended on the portion of the case occurring prior to the filing on 26 July 1968 of plaintiff's motion for further relief should be denied. A plan of desegregation in this cause conforming to what was thought to be the then existing legal standards, was developed and filed jointly by the parties on 22 July 1966. That plan was intended and treated by the parties as a final plan of desegregation, and a distinct break in the proceedings in this case occurred at that time. Previous to that time there had been two appeals taken successfully by the plaintiffs. The 1968 motion for further relief did not grow out of any evident intention of these parties to litigate that plan further, but was the direct result of subsequent Supreme Court decisions in the case of *Green v. County School Board of New Kent County, Virginia,* 391 U.S. 430 [88 S.Ct. 1689, 20 L.Ed.2d 716] (1968), and its companion cases which represented very significant new development in the law pertaining to school desegregation. The case at bar is similar to the case of *Wheeler v. Durham City Board of Education,* 585 F.2d 618 (4th Cir.1978), wherein the Court held that plaintiffs might timely file for a fee resulting from the continuous hearings and appeals on their motion for further relief, but denied a fee for earlier "discrete steps" in the litigation.

*Id.* at 6, 7.

■ The immediate question, then, is whether the May 30, 1972, order was the type of "final order," disposing of all issues at that time, contemplated by *Northcross.* This Court holds that the order of the Sixth Circuit on May 30, 1972, upholding the 1971 plan adopted by Judge Morton, was such a final order.

Plaintiffs have argued that the 1972 order was not a *Northcross* style "final order" because:

(1) the 1971 plan was appealed by both parties;

(2) the district court specifically retained jurisdiction;

(3) the plan was affirmed with the Sixth Circuit observing that matters regarding implementation could "be brought to the District Judge's attention when the case is back before him." *Kelley v. Metropolitan Cty. Bd. of Education,* 463 F.2d 732 at 746;

(4) there were further proceedings in 1971–72 in which the Board was allegedly adjudged to have engaged in bad faith implementation;

(5) plaintiffs continued to seek more effective desegregation and relief for the transportation burden placed on younger black students (Reply of Plaintiffs to Petition of Defendants filed on July 18, 1972, filed August 10, 1972), but those requests were not heard by the Court until 1978; and

(6) defendants sought modifications of the 1971 plan and those requests were also not heard until 1978.

Defendants rely heavily on Judge McRae's opinion in *Northcross* after the Sixth Circuit remanded the case to him to determine whether the 1966 plan in that

case was a "final order." The Board stated that the 1972 order in *Kelley,* like the 1966 order in *Northcross,* disposed of all outstanding phases of the case, including fees and costs. Citing language from *Northcross,* the Board calls the 1972 order a "discrete step" which constitutes a final order and precludes a retroactive award of attorney's fees. Furthermore, the Board claims that the precipitating factor for the 1972 order was *Green v. School Board of New Kent County,* 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), just as it was in *Northcross.*

The Court is not persuaded that the 1972 order cannot be considered "final" due to the fact that unlike the *Northcross* case, there was no consent order agreed upon by the parties here. An order entered by any court is no less "final" simply because one or more of the parties may have lingering doubts about the conclusion reached by the court. Nor is this Court's immediate decision altered by the fact that this court in 1971 expressly retained jurisdiction in the case. Where equitable relief is sought, a court will often retain jurisdiction to oversee the remedy and monitor its efficacy.

Plaintiffs' claim that no final order was entered because the Sixth Circuit stated that matters involving implementation could be brought to the District Court's attention also fails to support plaintiffs' position. By focusing on the *implementation* of the plan, plaintiffs at the time necessarily acknowledged that the plan adopted was a comprehensive one which addressed all outstanding issues, leaving only matters of implementation to be addressed.

Finally, plaintiffs argue that the 1972 order left open the question of whether the plan adopted by the District Court in 1971 placed a disproportionate burden on young black children. This claim is erroneous. Plaintiffs took that argument to the Sixth Circuit and that Court refused to overturn the District Court's plan in that regard. The Court stated:

> Plaintiffs-Cross-appellants claim that the grade school plan discriminates against Negro students in the lowest elementary grades.

> The feature complained of in this issue is the transportation of black students in grades 1–4 to outlying schools, paralleled by the cross-transportation of white students in grades 5–6. In this regard the HEW plan appears to follow the pattern of the school plan approved in *Swann. Swann v. Board of Education, supra,* 402 U.S. [1] at 10, 91 S.Ct. 1267 [at 1273], 28 L.Ed.2d 554. The Supreme Court made no reference to this feature, and neither in *Swann* nor in this case does the record seem to provide adequate rationale for it. We do not believe, however, that we can appropriately hold that the District Judge abused his discretion in approving the HEW plan which (like the plan in *Swann*) incorporated this feature.

463 F.2d at 746. Although the Court stated that the District Court could, at a later date, evaluate any adverse effects of the plan, plaintiffs' specific claim was heard and rejected on May 30, 1972, when the Sixth Circuit ruled that the District Court had not abused its discretion. Thus, as of May 30, 1972, there were no unresolved issues in the case.

This Court agrees with the defendants' characterization of the 1972 order as a "discrete step" which constituted a "distinct break in the proceedings" at that time. *See Northcross,* Civil Action No. 3931, January 14, 1982 (W.D.Tenn.). At the time of the 1972 order, the Sixth Circuit clearly viewed the 1971 plan as a "discrete step," saying:

> The order of the District Judge is the first comprehensive and potentially effective desegregation order ever entered in this litigation. The District Judge tells us that now the remedy is at least in sight.

463 F.2d at 734. Consequently, this Court concludes that the 1972 order was a "final order" and that "plaintiffs should not be permitted to reopen that judgment in order to obtain attorneys' fees." *Northcross, supra,* 611 F.2d at 635.

Plaintiffs' reliance on *Monroe v. Board of Commissioners of Jackson,* 581 F.2d 581 (6th Cir.1978) does not alter this Court's conclusion. There, the Sixth Circuit ordered $42,-

833 in fees to be paid under section 1988 for work done since the beginning of the litigation, even though a prior order in 1972 awarded $5,000 for costs incurred up to that point. *Monroe, supra,* at 582. This Court will not follow plaintiffs' reading of *Monroe* for two reasons. First, *Monroe* was a brief, *per curiam* opinion written in 1978. Its impact is reduced significantly by *Northcross,* which was written in 1979 and is regarded across the nation as one of the most thorough and comprehensive opinions on the award of fees under section 1988. Insofar as a plausible reading of *Monroe* conflicts with the *Northcross* guidelines, this Court will view *Northcross* as taking precedence. Second, because this Court is bound by *Northcross,* the "final order" factor is important. In this regard, *Monroe* can be distinguished from the instant case because the 1972 order of the Sixth Circuit in *Monroe* which approved the $5,000 fee award was clearly not a "final order," whereas the instant case did have a "final order" entered (coincidentally, in 1972).[2]

Thus, plaintiffs are only entitled to fees incurred after May 30, 1972. Therefore, plaintiffs' request of fees will be reduced by 917.8 hours and 36.4 days for the work performed by Williams in the law firm of Looby and Williams, and 550.7 hours and 44 days for work performed solo by Williams between 1969 and May 30, 1972. The total amount disallowed here comes to 1,468.5 hours and 80.4 days.

## C. Fees for Appellate Work

■ Plaintiffs have included in their request for fees amounts representing work performed at the appellate level. At the hearings on the fee issue, this Court ruled

that it would not entertain requests for fees for appellate work, relying on *Buian v. Baughard,* 687 F.2d 859 (6th Cir.1982). There, the Sixth Circuit held that

... a party must be entitled to receive costs on appeal as a result of the appellate court's award of costs before it is eligible to receive attorney's fees as a part of those costs under section 1988.

*Id.,* at 861.

Plaintiffs have encouraged this Court to adopt a narrow reading of *Buian,* but, due to the lack of any limiting language in the opinion itself, this Court cannot adhere to plaintiffs' interpretation. In fact, the *Buian* opinion contains clear and broad statements which this Court will follow unless subsequently ordered otherwise. The Sixth Circuit in *Buian* stated:

It is the duty of *this Court* to determine who is entitled to costs on appeal. In this case, in which no costs were taxed on the appeal on the merits, it would also violate this Court's mandate for the District Court to award attorney's fees as part of the costs under section 1988 because the party prevailed on the case as a whole but was not awarded costs on appeal.

*Id.* at 862. (emphasis added).

*Buian* went on to say:

In summary, we read section 1988 as requiring that attorney's fees be awarded to the party who has prevailed on the case as a whole only if costs are awarded to that party at the level for which fees for services are sought: the district court, the court of appeals, and the Supreme Court.

*Id.*

This distinction between the district courts, the court of appeals, and the Su-

---

**2.** Plaintiffs also cite *Monroe* to contest the Board's claim that the Sixth Circuit's failure to award plaintiffs' request for fees in 1972 is *res judicata* for purposes of this question. Because this Court's conclusion is based on the "final order" language of *Northcross,* it is not necessary to address the Board's *res judicata* analysis. The Court believes, however, that it would be inappropriate to give *res judicata* or collateral estoppel effect to the 1972 denial of fees. There, plaintiffs sought fees only for double costs incurred due to the Board's appeal of the 1971 plan, an appeal which plaintiffs described

as "frivolous" for purposes of their fees request under Rule 38 of the Federal Rules of Appellate Procedure. Rule 38 allows the court to award double costs to the prevailing party when frivolous appeals are taken. In the instant request, plaintiffs seek to recover fees for the entire costs of the litigation, not just for costs incurred while prevailing on a frivolous appeal. Consequently, this Court would not be inclined to give the Sixth Circuit's *sub silentio* denial of fees under Rule 38 *res judicata* effect in this action.

preme Court is jurisdictional in nature, according to *Buian:*

> Cost determinations are made at three levels: the district court, the court of appeals, and the Supreme Court. Each court has jurisdiction to make *de novo* awards of costs only for proceedings within its jurisdiction.

*Id.* at 861.

Thus, because section 1988 permits an award of attorney's fees "as a part of the costs," *Hutto v. Finney,* 437 U.S. 678, 679, 693–99, 98 S.Ct. 2565, 2568, 2574–78, 57 L.Ed.2d 522 (1978), this Court cannot, according to *Buian,* award fees for appellate work. Plaintiffs must petition the Court of Appeals, not the District Court, for appellate work. The Court notes that in its most recent decision, dated July 27, 1982, the Sixth Circuit ruled that each party was to bear its own costs on that appeal, which also precludes an award of fees for that appellate work. *Buian, supra,* at 861.

Consequently, plaintiffs' request will be reduced by the number of hours and days spent on appeals since May 30, 1972. This amounts to 115.8 hours and five days for Williams and 17.5 hours and two days for Dinkins. The request of Mr. Bill Lann Lee, who worked only on appeals, is denied in its entirety. As for Norman Chachkin, only 10 hours of his work was performed after May 30, 1972, and those hours were spent on an appellate brief. Thus, his request is denied in its entirety.

### D. *Other Specific Objections*

Defendants have submitted several other objections to plaintiffs' fee requests which will be addressed herein.

#### *Services Rendered by Mr. Looby*

The School Board argues that because the estate of Z. Alexander Looby was closed on November 22, 1972, there is no entity or person remaining to receive compensation for services performed by Looby. More-

over, the Board states that plaintiffs did not submit a breakdown of what services Mr. Looby performed, and therefore, the hours representing work done by Mr. Looby and Mr. Williams should be reduced by one-half. The position of the School Board is well taken. However, the Court need not address this factor due to its earlier ruling that no fees can be awarded for services rendered prior to the May 30, 1972, final order, which includes the services performed jointly by Messrs. Looby and Williams.

#### *"Collateral" Issues*

■ Defendants also call into question time spent by plaintiffs' counsel on what defendants characterize as "collateral" issues. Specifically, defendants cite time allocated for matters involving intervening parties, amicus curiae, or third parties, and not the Board of Education.[3] Defendants argue that they are not responsible for the conduct of these parties, and time spent on those matters should be disallowed as part of plaintiffs' fee request as against the Board. Although the defendants did not exercise control over these particular facets of the litigation, the congressional intent behind the Act militates against adhering to defendant's approach. Congress has mandated that a prevailing party's attorney should be compensated "as is traditional with attorneys compensated by a fee-paying client, for all time reasonably expended on a matter." *Northcross, supra,* at 636. A private sector attorney normally would be obligated to stay fully briefed on all aspects of his or her lawsuit, and no less should be expected of the plaintiffs' attorneys in this action. Thus, the hours spent on these matters shall be included in the award.

#### *Fees for Time Spent with Consultants*

■ Next, defendants question fees claimed for preparation with two consultants, Dr. Hugh Scott and HGH Associates.

---

**3.** Defendant also challenges time spent regarding plaintiffs' request for an injunction against the Board of Education and the Tennessee Secondary School Athletic Association prohibiting the proposed suspension of Cameron High School from participating in organized sports. Proceedings on this matter were held in 1968, which means that the disputed time here has already been disallowed pursuant to the "final order" ruling as stated earlier in this opinion.

Defendants point out that HGH Associates proposed a desegregation plan which was never approved, either at the trial or appellate levels. However, it is not proper for this Court to dissect this lawsuit into "issues and parts of issues as to which plaintiffs did not prevail." *Northcross, supra,* at 636. The fees claimed for time spent with HGH Associates shall be allowed.

■ The question raised by defendants regarding Dr. Hugh Scott poses an altogether different concern. Defendants note that the hearings held by this Court in 1979 and 1980 involved lengthy testimony by Dr. Hugh Scott, plaintiffs' expert witness. Further, defendants point out that this Court's plan, as adopted in 1981, was based in a significant measure upon the testimony of Dr. Scott, only to have the plaintiffs subsequently alter their position. In essence, plaintiffs rejected the testimony of Dr. Scott in subsequent proceedings. As to this factual issue, the position taken by defendants is entirely correct. Plaintiffs selected this expert, put him on the witness stand, and knew what his testimony would be. Plaintiffs then made the decision to repudiate Dr. Scott's testimony, and that decision now acts to estop plaintiffs from seeking to recover attorney's fees against the defendant Board of Education for time spent by plaintiffs' counsel with Dr. Scott. The Sixth Circuit has held that

> [s]o long as the party has prevailed on the case as a whole the district courts are to allow compensation for hours expended on unsuccessful research or litigation, unless the positions asserted are frivolous or in bad faith.

*Northcross, supra,* at 636. Assuming that standard applies in this instance as well, plaintiffs' utilization and subsequent repudiation of Dr. Scott was frivolous, at best. Plaintiffs' request will be reduced only by the time clearly attributable to Dr. Scott.

General requests regarding expert witnesses will not be eliminated since the Court cannot determine from the affidavits whether those requests pertain to Dr. Scott or other consultants. The amount deducted here amounts to two days and three hours for Mr. Williams and four hours for Mr. Dinkins.

*"Unreasonable and Excessive" Requests*

Defendants have sifted through the affidavits of plaintiffs' counsel and registered specific line-item objections to the amount of hours claimed for specific tasks performed. On a more general level, defendants seek an across-the-board percentage reduction for duplication of effort among defense counsel and the fact that the request for fees was based on reconstructed time records. On the latter topic, defendants argue that plaintiffs' local counsel have never kept daily time records, even though they submitted requests for fees as long ago as 1974. Defendants propose a twenty percent reduction for reconstruction, based on the figure utilized by the district court in *Heigler v. Gatter,* 463 F.Supp. 802 (E.D.Pa.1978). Further, defendants argue for a ten percent reduction due to duplication of effort among the several attorneys for the plaintiffs, citing *Weisenberger v. Huecker,* 593 F.2d 49, 54 (6th Cir.1979); *Oliver v. Kalamazoo Board of Education,* 576 F.2d 714, 715 n. 2 (6th Cir.1976).

■ Rather than pick out specific hours which appear to be duplicative or excessive, this Court has taken the "arbitrary but essentially fair" approach of deducting a small percentage of the total hours to eliminate duplication and padding, and to compensate for the use of reconstructed time records. *See Northcross, supra,* at 636–637. A ten percent reduction here appears reasonable.[4] Thus, plaintiffs' request shall be

4. A slightly higher percentage would be appropriate here, but for two factors. First, plaintiffs' counsel in their affidavits claim that their documented request did not include a significant amount of time spent on phone calls, and other conversations among counsel. This statement militates against defendants' request

to apply a twenty percent reduction for reconstructed time as well as defendants' objections as to padding. Second, some, but not all, of the duplication here occurred between local counsel and those attorneys hired for appellate purposes. This Court has already ruled that it cannot entertain plaintiffs' request for appel-

reduced by 54.5 hours and 3.83 days for Mr. Williams and 19.81 hours and 3.6 days for Mr. Dinkins.

### E. Reasonable Rates

■ *Northcross* makes it clear that a fee based on the hours of service provided is the preferred approach to this request. 611 F.2d at 636. The level of compensation should represent the fair market value of the services provided, and despite defendants' arguments to the contrary, current hourly rates should be applied to plaintiffs' request, even for work performed some ten years ago. This method avoids the problem of taking proof to ascertain the fair market value of the services in prior years and, more importantly, takes inflation into account.

This Court has taken extensive proof regarding the prevailing rate charged by experienced and skillful trial lawyers in this region. From this proof, it appears that the prevailing market rate in federal court litigation for an attorney of Mr. Williams' experience and skill is $100 per hour for office work and $1,000 per trial day. A reasonable rate in this community for Mr. Dinkins, who began working on this case upon gaining admission to the Bar five years ago, is $60 per hour and $600 per trial day.

■ Plaintiffs request that a contingency factor of 100 percent be applied to these rates, due in part to the difficulty of this prolonged litigation and its unpopularity in some sectors of the community.[5] An upward adjustment of some type is appropriate here. *See Northcross, supra,* at 638–39. However, the Court concludes that a contingency factor of 25 percent will serve the purpose of the Fees Award Act, i.e., to attract competent counsel by awarding adequate compensation. With this upward adjustment of 25 percent, the effective hourly rate will be $125 for Mr. Williams and $75 for Mr. Dinkins. The daily rate for trial time will be $1,250 and $750, respectively.

The compensation for Mr. Williams is based on the following calculations:

*Mr. Williams* (individually):

| | hrs. | | days | |
|------|--------------|------|------|-------------------------------|
| | 1,221.5 hrs. | | 87.3 days | (amount requested) |
| less | 550.7 hrs. | less | 44.0 days | (pre May 30, 1972 work) |
| = | 660.8 hrs. | = | 43.3 days | |
| less | 115.8 hrs. | less | 5.0 days | (appellate work) |
| = | 545.0 hrs. | = | 38.3 days | |
| less | 3.0 hrs. | less | 2.0 days | (time spent with Dr. Scott) |
| = | 542.0 hrs. | = | 36.3 days | |
| less | 54.2 hrs. | less | 3.63 | (10% across the board reduction) |
| = | 487.8 hrs. | = | 32.67 days | |

487.8 hrs. × $125 ($100/hr. × .25 contingency) = $ 60,975.00
32.67 days × $1,250 ($1,000/day × .25 contingency) = 40,837.50

Total = $101,812.50

late fees and consequently, that duplication cannot be considered here. Thus, a total reduction of ten percent appears to be an appropriate response to defendants' objections as to padding, duplication, and the use of reconstructed time records.

**5.** Defendants argue that *no* contingency factor should be applied because the defendants stipulated at the very beginning of this litigation that Nashville schools were unconstitutionally segregated. While this is true, this lawsuit has progressed through several distinct phases, and plaintiffs have, for the most part, continued to prevail, over and above the initial inquiry as to defendants' liability.

*Mr. Dinkins:*

| | 215.6 hrs. | 38.0 days (amount requested) |
| less | 17.5 hrs. | 2.0 days (appellant work) |
| = | 198.1 hrs. | 36.0 days |
| less | 4.0 hrs. | 0.0 days (time spent with Dr. Scott) |
| = | 194.1 hrs. | 36.0 days |
| less | 19.41 | 3.60 (10% across the board reduction) |
| = | 174.69 hrs. | 32.4 days |

174.69 hrs. $\times$ \$75 (\$60/hr. $\times$ .25 contingency) = \qquad \$ 13,101,75

32.4 days $\times$ \$750 (\$600/day $\times$ .25 contingency) = \qquad 24,300.00

Total = \qquad \$ 37,401.75

Mr. Williams shall be awarded \$101,812.50 and Mr. Dinkins shall receive \$37,401.75.

## IV. *Costs*

Plaintiffs also seek to recover certain costs pursuant to Rule 54(d), Fed.R.Civ.P., and Rule 13 of the Local Rules of Court.

Included in plaintiffs' request are costs involved with plaintiffs' appeal of this Court's 1981 decision to the Sixth Circuit Court of Appeals. The Sixth Circuit affirmed this Court's opinion in part, reversed in part, and remanded for further proceedings. That order, dated July 27, 1982, also stated that each party was to bear its own costs in the appeal. Order dated July 27, 1982, No. 81–5370. Thus, plaintiffs' request for costs incurred on that appeal has already been denied, and cannot be granted by this Court. This eliminates all of the costs incurred by Mr. Lee, and those expenses incurred by Mr. Williams after April 17, 1981, the date of this Court's order.

Plaintiffs' Bill of Costs also contains items which traditionally are not taxable as costs under Rule 54(d). These include expenditures for postage, telephone calls, photocopying, and meals. See 10 Wright, Miller & Kane, *Federal Practice and Procedure: Civil 2d* § 2677 at 370–373 (1983). Certain of the expenditures are taxable, however, under section 1988. The Sixth Circuit in *Northcross* held that

[t]he authority granted in section 1988 to award a "reasonable attorney's fee" included the authority to award those reasonable out-of-pocket expenses incurred by the attorney which are normally charged to a fee-paying client, in the course of providing legal services. Reasonable photocopying, paralegal expenses, and travel and telephone costs are thus recoverable pursuant to the statutory authority of § 1988.

611 F.2d at 639.

■ Thus, plaintiffs are entitled to recover costs incurred for postage, telephone calls, parking, photocopying, and air freight, as long as those costs were incurred prior to April 17, 1981, the date of this Court's order. As stated earlier, plaintiffs were ordered to bear their own costs on the appeal. The amount taxed as costs here amounts to \$361.28, based on the affidavit of Mr. Williams. Meal expenses incurred by Mr. Williams are disallowed, as are the undocumented expenses of Mr. Dinkins, listed in the amount of \$144.87.

■ Turning now to costs relating to expert witnesses, fees paid to Dr. Scott and HGH Associates to retain their consulting services are not to be taxed against defendants. Normally, Dr. Scott's expenditures for travel, subsistence, and overnight accommodations would be taxable pursuant to 28 U.S.C. § 1821. However, "the award of statutory costs is a matter for the district court, in its best judgment as to what was reasonable and necessary." *Northcross, supra*, at 640. For the reasons stated earlier regarding the recovery of attorney's fees for time spent with Dr. Scott, expenses incurred by Dr. Scott are also disallowed. The Court finds that it would be unreasonable to tax Dr. Scott's expenses against defendants. Plaintiffs will not be heard at

this juncture to claim that Dr. Scott's testimony was "relevant and material" or "reasonably necessary" to support the position taken by the plaintiffs in this litigation. *See 6 Moore's Federal Practice* ¶ 54.77[5.–1] (2d ed. 1982) and cases cited therein.

In all other respects, plaintiffs' request for costs shall be denied. Costs in the amount of $361.28 shall be taxed against defendants.

## V. *Contempt*

The remaining issue to be resolved at this time is plaintiffs' petition for contempt, filed December 27, 1976, and amended August 28, 1978. The gravamen of the petition is that defendants have intentionally engaged in a course of conduct which violated this Court's prior order entered in 1971. The 1971 order enjoined the use of portable classrooms for any purpose other than integration. It also enjoined the Board from renovating or enlarging by either construction or use of portables any schools that served less than fifteen percent black students after implementation of the plan.

Plaintiffs allege that the Board violated the order by using portables to implement a kindergarten program, by using the vacated Turner Elementary School as an annex for Cole Elementary, by expanding Hillsboro, Glencliff, Hillwood, Maplewood, Overton, and Stratford High Schools, and by proposing to build a Goodlettsville-Madison Comprehensive High School.

The Board contends that none of the acts alleged to be violations of the 1971 order actually constituted proscribed activity under the restrictions imposed by the Court. Moreover, the Board states that it diligently notified the Court and counsel for plaintiffs regarding any changes in the school system, even when the Board's attorney found that the changes were not of the type requiring prior judicial approval.

Regarding the use of portables at the kindergarten level, the Board argues that the 1971 order never addressed kindergar-

ten, and that the HEW plan did not include them. The Board relies on proof presented at hearings in 1979, where a Board official testified that new portables had been placed only at schools having fifteen percent black students under the plan as implemented, or in elementary schools to permit the opening of kindergartens. Finally, the Board points out that it petitioned this Court on May 30, 1973, for explicit approval of the plan to use portables in this manner. This petition was never acted upon.

The Board also notified the Court concerning its plans to use Turner as an annex for Cole Elementary School, although the notification did not take the form of a formal pleading. In implementing this change, the Board claims that it relied on the precedent of a 1972 ruling by this Court approving the use of an annex at Mt. View Elementary School to relieve overcrowding at Lakeview Elementary School, and on the fact that other similar changes had been adopted without any expressed dissent from the Court or counsel for plaintiffs. The Board also claims that the 1971 order was silent as to the use of closed, existing buildings to relieve over-crowding.

Turning now to the Board's decision to expand certain high schools, the Board filed its original proposal with the Court on May 30, 1973. For the next two or three years, the Board claims to have notified the court of revisions in its plan for area high schools. Eventually, the Board implemented some of the proposals under the belief that the schools affected did not come under the 1971 order because they would continue to maintain a black population of fifteen percent or more. Plaintiffs' other allegation concerning the proposed Goodlettsville-Madison Comprehensive High School is not well founded in that the school was never built. As discussed in this Court's 1980 Memorandum and Order,[6] the 1971 Court order specifically enjoined the construction of the Goodlettsville-Madison High School as proposed because it was to be located within the city limits of Goodlettsville, a location which would have promoted segre-

6. *See Kelley, supra,* 492 F.Supp. at 174.

gation. The subsequent proposal, although never implemented, called for the school to be built nearer to the imaginary line of Briley Parkway extended, thereby arguably conforming with this Court's directive. According to Board officials, the school, under this revised plan, had a projected black enrollment of greater than twenty percent.

Finally, plaintiffs contend that the Board's action in closing certain schools or changing the grade levels accommodated by particular schools somehow violate the 1971 order. Plaintiffs contend that these decisions demonstrate a discriminatory motivation on the part of the Board. The Board has responded by setting forth its objective reasons for making changes in schools located in predominantly white as well as predominantly black neighborhoods, and argues these actions in no way contravened the letter or the spirit of the 1971 order.

From the preceding recitation of the facts and positions asserted by the parties, this Court concludes that the contempt charges against the defendants should be dismissed. This Court finds that the Board, in the years following the 1971 order, acted in good faith in its efforts to comply with that order while going about the task of operating a school system. There is no proof that the Board's actions were a subterfuge to undermine the 1971 order. Furthermore, there is no evidence that the decisions of the Board were part of an effort to block the desegregation of the Metropolitan Nashville city schools. This Court has consistently found that the Board has acted in good faith in implementing the 1971 order. Plaintiffs claim in this motion for contempt that this Court had previously found that the schools became resegregated due to the Board's efforts to accommodate white flight into the suburbs. This contention is totally incorrect. During the December 1982 hearings this Court explained its position on this question, stating that the resegregation resulted not from actions taken by the Board, but rather, from the 1971 plan itself which did not include the outer-reaches of Davidson County. Even after this explanation, plaintiffs continue to press forward with their inaccurate interpretation of this Court's opinion. It is time to lay that false allegation to rest once and for all.

As stated by the Supreme Court and repeated by the Sixth Circuit, "the judicial power of contempt is a potent weapon." *Reed v. Cleveland Board of Education,* 607 F.2d 749, 752 (6th Cir.1979), quoting from *ILA, Local 1291 v. Philadelphia Marine Trade Association,* 389 U.S. 64, 76, 88 S.Ct. 201, 208, 19 L.Ed.2d 236 (1967). Such a potent weapon should be used only where the evidence of contempt is clear and convincing. That is not the case here. The Board acted only where, upon the advice of counsel, it felt the 1971 order provided some latitude, and diligently notified the Court and plaintiffs about proposed changes, although little guidance from this Court was forthcoming once the 1971 order was entered. To find the Board in contempt, it would be necessary to read more into the 1971 order than was stated in its clear and express terms, and that type of approach to a contempt charge is impermissible. *Reed, supra,* at 752 ("[t]he notice of a judicial order upon violation of which a contempt finding may properly be based is such notice as would clearly tell a reasonable person what he is required to do or abstain from doing").[7]

The facts in this case, as presented to this Court, simply do not warrant a finding that the Board's actions placed it in contempt.

An appropriate order shall enter.

---

7. Additionally, *Reed* states that "defendants were required to obey the District Judge's orders, but they were not required to obey the interpretations of the District Judge's orders made by plaintiffs." 607 F.2d at 752.